John **PRITCHETT**, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. CIV.A. 01–G–2170–M.

United States District Court, N.D. Alabama, Middle Division.

Sept. 9, 2003.

ermo, III, Social Security Administration–Office of General Counsel, Atlanta, GA, for Jo Anne B Barnhart, Commissioner of Social Security Administration, defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

The plaintiff, John Pritchett, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Disability Insurance Benefits (DIB), a Period of Disability (POD) and Supplemental Security Income Benefits (SSI).[1]

Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).[2]

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth,* at 1239 (citations omitted). Sub-

Myron K Allenstein, Allenstein & Associates, Gadsden, AL, for John Pritchett, plaintiff.

Alice H Martin, U.S. Attorney, Winfield J Sinclair, U.S. Attorney's Office, Birmingham, AL, Mary Ann Sloan, Joseph P Pal-

1. In general the legal standards to be applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB), to establish a "Period of Disability," or to recover Supplemental Security Income (SSI). However, different statutes and regulations apply to each type of claim. Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2. 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

stantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth,* at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

■ In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993); *accord McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir.1986). "Once the claimant has satisfied Steps One and Two,

she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope,* at 477; *accord Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995).

■ In the instant case, the ALJ, Jerome Munford, determined the plaintiff met the first two tests, but concluded did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform his past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." *Foote,* at 1559. Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical–Vocational Guidelines (the grids). *Foote,* at 1558–59. The presence of a non-exertional mental impairment, also prevents exclusive reliance on the grids. *Foote,* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." *Foote,* at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES HE SUFFERS FROM PAIN OR OTHER SUBJECTIVE SYMPTOMS

■ In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Foote,* at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can

be reasonably expected to give rise to the alleged pain.

*Foote,* at 1560 (quoting *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991)). In this circuit medical evidence of pain itself, or of its intensity, is not required.

While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, *neither requires objective proof of the pain itself.* Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard *a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself. See* 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. Railroad Retirement Bd.,* 921 F.2d 1210, 1215 (11th Cir.1991)(parenthetical information omitted)(emphasis added). This same standard applies to testimony about other subjective symptoms. Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote* at 1561. Therefore, if a claimant testifies he suffers from pain or other subjective symptoms at level that would prevent work and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited.

▇▇▇ When the Commissioner fails to credit a claimant's testimony about pain or other subjective symptoms, he must articulate reasons for that decision.

It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

*Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's testimony, or if his reasons are not supported by substantial evidence, the testimony of the plaintiff about his subjective symptoms must be accepted as true.

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY WHEN PAIN OR OTHER SUBJECTIVE SYMPTOMS ARE INVOLVED

▇▇▇ It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers within the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir.1999).

▇▇▇ If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is

posed to the VE. *See Gamer v. Secretary of Health and Human Services*, 815 F.2d 1275, 1280 (9th Cir.1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit the plaintiff's pain testimony is found not to be supported by substantial evidence.

In *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396 (9th Cir. 1988), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. *Id.* at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." *Id.* If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As *Varney* recognized, if the VE testifies the claimant can perform no jobs if his pain testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited. *Id.*

### THE MEDICAL EVIDENCE

The plaintiff filed his claim for disability benefits on February 18, 1999, after being "involved in a motor vehicle accident on 2/12/99, in which he was driving under the influence of alcohol and ran off the road into a fence and struck a tree." [R 191] As a result of the automobile accident, the plaintiff suffered a severe head injury, brain injury, a fractured clavicle and multiple contusions. His admission evaluation in the emergency room revealed "closed head trauma, multiple contusions, and an irregular heart rate for which he was monitored." [R 191] His hospital course was summarized by Dr. Ruiz:

> He initially was comatose, difficult to arouse. CT scan was unremarkable except for cerebral edema. He did have a traumatic subarachnoid hemorrhage.[3] He was confused. He moved all four extremities. He remained on the Neurosurgery Service in the Intensive Care Unit. He has a history of alcohol abuse. He was watched closely for delirium tremens. He had occasional abnormal heart beats. For this reason, echocardiogram was performed. It was normal. Dr. Feist has followed the patient in the past with history of depression following the death of his wife and fiance and has been drinking excessively. He had a history of suicide attempt. During his hospital course he was found to have a fractured clavicle which was addressed. His depression was addressed by Dr. Feist. Neurologically, his condition remained basically unchanged. He remained withdrawn. Dr. Feist did adjust his medication during this hospital course. CT scan continued to show a swelling with small intra cerebral hemorrhage. This was followed throughout his hospital course. When he reached maximal hospital benefit, arrangements were made for discharge at home.

---

3. "Subarachnoid hemorrhage occurs when there is bleeding into the space between the brain and the arachnoid membrane (the middle membrane covering the brain)." *http://www.nlm.nih.gov/medline-plus/ency/article/000701.htm* "The disorder may cause permanent brain damage from ischemia (loss of blood flow) or from the presence of blood in and around the tissues of the brain." *Id.*

[R 191] The plaintiff was discharged on March 6, 1999. Dr. Ruiz's discharge diagnosis was: 1) Closed head trauma, 2) Stupor and coma, 3) Cerebral contusion, 4) Closed fracture of the clavicle, 5) Depressive disorder, and 6) Contusions at multiple sites. [R 191]

Dr. Feist's notes reveal the following:

I saw this 38–year–old man, a patient of Dr. Ruiz, on 02/17/99. He was admitted to the hospital on 02/12/99 following a motor vehicle accident with closed head trauma.....

His mother related that on the date of admission he was driving in his pickup truck and ran off of the road into a fence and struck a tree. At this time he is quiet, withdrawn, complains of feeling hot. He is confused.....

His mother related that he has been depressed. He did drink some in the past. She is unaware of any particular drug usage, but says that he may have used some drugs five years ago. His wife, to whom he had been married for eight months, died of a "heart attack" when 24 years of age. He became depressed following her death and is said to have drunk more after this. He then began to date another girl. The mother says that she drank and may have taken drugs. They planned to marry; however, she committed suicide two years ago by taking Tylenol and drinking liquor. Her family is said to have blamed him for not getting her to the hospital sooner after this occurred. Since then he had been more depressed and has drunk more. He has had two DUIs and has been to DUI school in Calhoun County and has been seen by the Mental Health Center in Calhoun County.

After the death of his fiancee he attempted suicide by alcohol and medication. His mother is unsure as to whether he had the motor vehicle accident on accident or intentionally. At this time the patient is unable to provide information leading up to the accident.

[R 188] Dr. Feist's impression was:

AXIS I: 1) Motor vehicle accident on 02/12/99 with closed head trauma and confusion. 2) History of alcohol abuse. 3) History of suicidal attempt by overdose of alcohol and pills two years ago.

AXIS II: Deferred.

AXIS III: 1) Motor vehicle accident with closed head trauma prior to this admission. 2) History of motorcycle accident with soft tissue injury of his leg while in high school.

AXIS IV: Stressors—Deaths of wife and of fiancee.

AXIS V: Global Assessment of Functioning—30 current.

PLAN: Will follow and start antidepressant medication .... He will need therapy and medication for his depression and treatment of his alcohol problem.

[R 189]

The plaintiff followed-up with Dr. Ruiz on March 23, 1999. Dr. Ruiz noted the plaintiff suffered from a "chronic depressive psychiatric disorder." [R 250] The plaintiff complained of "capricious and altered patterns for sleeping, eating, recent memory problems and alternating periods of depression with agitation and irritability." [R 250] Dr. Ruiz recommended that a CT scan be performed. On April 20, 1999, the plaintiff was again seen by Dr. Ruiz, who noted that the plaintiff "continues to experience diffuse headaches that appear suddenly associated with irritability and periods of 'anger'." [R 249 (Emphasis in original).] Dr. Ruiz noted the "CT scan show[ed] an area of encephalomalacia[4] in

---

4. Encephalomalacia is "softening of the brain, especially that caused by an infarct." *Dorland's Illustrated Medical Dictionary* 549 (28th Edition).

the right temporal lobe without any other pathological changes." [R 249]

On July 9, 1999, the plaintiff was referred by the Social Security Administration to Dr. Robert Storjohan, Ph. D., for a psychological evaluation. Dr. Storjohan noted that the plaintiff reported the following activities:

He does housework, laundry, cooking, and shopping. He also does yard work. He has no crafts or hobbies in which he participates. He does not go fishing or hunting. He gets exercise by walking and riding a stationary bicycle. He also goes to a fitness center on a daily basis to workout. He spends time visiting with his mother, sister, and brother. He watches television and listens to the radio or stereo. He occasionally talks on the telephone with others. He is not dating anyone at this time. He attends church regularly.

[R 254] Dr. Storjohan's mental status evaluation revealed the following:

His thoughts and speech flowed at a normal pace which was free of loose associations and confusion. He displayed a normal range of affect which was consistent with the content of the interview. He displayed no affective lability. He did not [appear] to be anxious. His mood was within normal limits. No psychotic indices were noted either in process or content. He was alert and oriented in all spheres. He put forth good effort during the testing portion of this evaluation, so the test results appear to represent an accurate appraisal of his current abilities.

[R 254] The psychometric testing administered by Dr. Storjohan included the WAIS–III, which revealed a Verbal IQ of 86, a Performance Scale IQ of 76, and a Full Scale IQ of 79. [R 254] Dr. Storjohan concluded that the plaintiff would have "moderate deficits in his ability to understand, carry out, and remember instruc-

tions in a work setting," and "moderate deficits in his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting." [R 255]

The plaintiff was examined at the request of the Social Security Administration by Dr. Rickless on April 17, 2000. Dr. Rickless found a full range of motion in the plaintiff's left shoulder, elbow, wrist, mp, pip and dip joints with normal sensation. [R 268] Dr. Rickless's examination of the plaintiff's right shoulder revealed that it was "tender superficially." [R 268] He noted the "range of motion of the right shoulder is limited in the exam room" with "[f]orward flexion 60 degrees abduction 70 degrees." [R 268] Internal and external rotation was normal. [R 268] The remainder of Dr. Rickless's physical examination was unremarkable. Dr. Rickless also, noted the plaintiff's behavior outside of the office:

Patient was observed outside the office, his carriage of his right upper extremity was different than in the office, it was down by his side swinging it back and fourth. I observed him to raise his hand very casually and easily to brush his hair on the right side. He also opened the car door with his right arm and got in the car. This is certainly different from his position in the exam room.

[R 268–69] Dr. Rickless also noted:

Major limitation measurements in the exam room. Range of motion outside appeared to be somewhat different which puts into doubt the validity of some of the measurements. He has normal gait, no motor or sensory deficits. He appeared to be hyper-reflexive, this may relate to the cerebral trauma. No muscle spasms, no difference in circumferential measurements. He had somewhat decreased strength in the right upper extremity. It is hard to tell if this is real or not. I did not get the

impression that there was full effort made. He can button buttons, tie shoe laces, pick up small objects, hold a glass and turn a door knob. Does not use any ambulatory aids.

[R 269] Dr. Rickless limited the plaintiff to lifting 11–20 pounds occasionally and more than 20 pounds never. [R 270] Dr. Rickless indicated the plaintiff could lift or carry up to 10 pounds frequently, and could sit, stand and walk for a total of eight hours each at one time. [R 270–71]

Dr. Samuel E. Fleming, III, Ph. D., conducted a neuropsychological evaluation at the request of the Social Security Administration on December 8, 2000. At the evaluation, the plaintiff denied ever having been evaluated or treated by a mental health practitioner. [R 299] Dr. Fleming noted that there was "no evidence of hallucinations, delusions, ideas of reference, phobias, obsessions or compulsions." [R 300] The plaintiff's affect was appropriate and there were no signs of anxiety. [R 300] Dr. Fleming found no evidence of mania, but noted the plaintiff "did report occasional problems with depression." [R 300] Dr. Fleming continued:

He has restlessness during the night and also terminal insomnia. Energy level and motivation were both described as poor. He stated that he has blue spells approximately once per month that last an hour or two. He denied suicidal ideation or intent.

[R 300] Dr. Fleming's report contains the following:

[H]e spends his day watching television, reading and helping his mother. He also attends Head Injury Society Meetings once per week. He is capable of doing household chores and stated that he lives on his own.

[R 300]

Dr. Fleming administered the WAIS–III and the Minnesota Multiphasic Personality Inventory (MMPI). The WAIS–III yield-ed a verbal IQ of 76, a performance IQ of 70, and a full scale IQ of 71. [R 301] Dr. Fleming noted the plaintiff "demonstrated poor motivation during this testing. He seemed more interested in getting finished and leaving than he was in his performance." [R 301] Dr. Fleming noted as follows:

There has either been a decline in cognitive abilities or his overall low scores were a function of his lack of effort. I would estimate a premorbid IQ=95 which is in the average range. There was some intra-subtest scatter noted and this along with a pattern of subtest scores suggested that Mr. Pritchett indeed did not perform up to his full capabilities. These scores are likely an underestimate of his true intellectual abilities.

[R 301]

Dr. Fleming interpreted the plaintiff's MMPI as follows:

[The plaintiff] generated a valid MMPI profile that suggested he is currently feeling [quite] negatively towards himself and is experiencing a significant amount of emotional distress. Individuals of this profile type typically evidence over-concern with somatic complaints and tend to be passive individuals. A variety of somatic complaints is apt to be vocalized including chronic fatigue, pain and weakness as well as diarrhea, loss of appetite and insomnia. These patients are generally listless and anxious, lacking in self confidence and tend to turn hostile feelings inward on themselves. They may be very defensive and unable to deal with negative emotions. Passive, whiny personality features are apt to be evidenced even when chronic disease is present. When chronic disease is documented, one can expect an exaggeration of complaints and symptomatology, These individuals occasional

[sic.] shop from physician to physician. Most likely diagnosis given this profile include major depression, somatoform disorder or psychological factors affecting physical condition. Underlying personality traits include dependent personality, passive-aggressive personality, avoidant personality.

[R 301] Dr. Fleming's diagnosis was as follows:

AXIS I: ALCOHOL DEPENDENCE (IN REMISSION). MAJOR DEPRESSION, SINGLE EPISODE, MODERATE PSYCHOLOGICAL FACTORS AFFECTING PHYSICAL CONDITION. COGNITIVE DISORDER, NOS.

AXIS II: MIXED PERSONALITY DISORDER (DEPENDENT, PASSIVE–AGGRESSIVE AND AVOIDANT TRAITS). BORDERLINE INTELLECTUAL FUNCTIONING ACCORDING TO TEST RESULTS.

AXIS III: CLOSED HEAD TRAUMA

AXIS IV: DEFERRED

AXIS V: GAF = 50 [5]

[R 301] In his conclusion, Dr. Fleming recounted the results of the psychometric testing noted above. He remarked on the plaintiff's symptoms resulting from his closed head trauma:

Mr. Pritchett also presented a number of symptoms related to his closed head trauma including impaired short term memory and concentration, migraine headaches, loss of temper and anterior grade and retrograde amnesia. *Mr. Pritchett does not seem capable of coping with the demands of a normal work day environment. While he is capable of understanding and carrying out instructions, he would have difficulty recalling them.* Interactions with co-workers and supervisors would likely be adequate.

[R 302 (emphasis added).] Dr. Flemings' recommendation was "that Mr. Pritchett be referred to Vocational Rehabilitation for evaluation and possible training and placement." [R 302]

Dr. Fleming completed a "Medical Source Opinion Form (Mental)" [R 303–304] on which he indicated the plaintiff's limitation in the following areas would be "mild," which the form defines as "No more than slight or minimal limitation:"

- Respond appropriately to co-workers
- Respond appropriately to customers or other members of the general public
- Use judgment in simple one or two step work-related decisions
- Maintain social functioning
- Maintain activities of daily living

Dr. Fleming indicated the plaintiff's limitation in the following areas would be "moderate," which the form defines as "affects but does not preclude ability to function:"

- Respond appropriately to supervisors
- Use judgment in detailed or complex work-related decisions
- Deal with changes in a routine work setting
- Understand, remember, and carry out simple, one and two-step instructions
- Maintain attention, concentration or pace for periods of at least two hours

**5.** The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th Edition) ("DSM–IV"). It does not take into account impairment in functioning due physical or environmental limitations. DSM–IV at

32. A GAF of 41–50 indicates: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 32 (emphasis in original deleted).

Dr. Fleming indicated the plaintiff's limitation would be "marked," which the form defines as "seriously interferes with ability to function," in his ability to "[u]nderstand, remember, and carry out detailed or complex instructions." Dr. Fleming included a marginal note beside this entry as follows: "Full Scale IQ in borderline range limits understanding." [R 304]

In November 1999 the plaintiff was referred to the Calhoun–Clebourne Mental Health Center in connection with his DUI conviction. In the clinical section of the initial "Adult Psychosocial Assessment," it was noted that the plaintiff's recent and remote memory was intact, with the following explanatory note: "But can't recall events of MVA in February. He also [illegible] frequent loss of short-term memory." [R 279] The plaintiff was referred to a psychiatrist on July 12, 2000, because he "has [a] problem with intermittent explosive disorder." [R 283] The psychiatrist noted he had had "episodes of violence and anger," which were triggered by arguments. [R 283] These episodes were primarily verbal, but he had also "attempted to hit others." [R 283] Following this is a plus sign in a circle (indicating "positive") and then "head injury." [R 283]

## DISCUSSION

The plaintiff testified at the hearing before the ALJ that he suffered disabling symptoms as a result of the closed head trauma he suffered when he was involved in a motor vehicle accident. He testified that his short term memory is so bad that he cannot remember things 30 minutes or so after they occur. [R 47] He testified his memory is getting worse. [R 47] He has problems doing simple arithmetic and is unable to perform jobs that have two or three tasks because he cannot remember the sequence of tasks. [R 48–49] He is unable to concentrate well enough to watch television shows that last longer than 30 minutes. [R 49] He testified that he gets frustrated and angry because he is unable to do the things he was able to do before his accident. [R 55–56]

The plaintiff's mother also testified that the plaintiff had emotional outbursts and seemed agitated since his accident. [R 61] She testified that his irritability and frustration was due to his inability to accept the mental limitations that resulted from his brain injury. [R 61] She gave as an example an incident when he had hung a sheet of paneling diagonally. [R 61] She testified that he didn't see anything wrong with the job and believed he had done a good job. [R 61] She testified he cannot count money because of his inability to concentrate. [R 62] Another example of the impact of the plaintiff's brain injury was that after buying a new lawn mower, the plaintiff took it apart the following day, even though there was nothing wrong with it. [R 63] The following is another example given by the plaintiff's mother:

> He was going to get a job cutting grass. Okay, he told the lady that he would cut it whatever she thought it was worth. He finished—well, he really didn't finish. He got part done, but the day was up, and she said, I'll go ahead and pay you and you can come back tomorrow. How much do I owe you, and John, said whatever you think. She gave him $ 40, and he said, you should of paid me more. It was $ 140. I want you to pay me $140, and he got angry with her that he couldn't—I mean, he was unable to control his, you know, his outbursts. He had no reason in there. Went up to his grandmother's. Was going to cut her grass, and he told her—she said she paid $ 20 for getting it cut, and when he finished to cutting her grass, he told her that he—she owed him $ 75, you know, and that's, that's not normal for him, you know, to make those kind of, you know, reasoning things.

[R 63] The plaintiff's mother testified that he had gained almost 100 pounds since the accident because he forgets that he eats. [R 64] She testified that he will go into the bathroom to take care of his personal hygiene, and just stand there. "He'll forget why he went in there and what he went in there to do, and it's—I know it's frustrating to him." [R 64]

The ALJ questioned a Vocational Expert (VE) at the conclusion of the hearing. The VE was asked various hypothetical questions concerning the plaintiff's ability to perform work related activities. The VE was asked to assume the plaintiff had the following restrictions:

> [A] younger individual with a high school education. With the limitations of no pushing or pulling involving the right upper extremity. I think he should be restricted to simple repetitive non-complex tasks. I don't believe that he should work in what I call a high stressed production/quota position. So, it should be non-production quota..... A borderline IQ. Those are the limitations right now, and we'll classify his pain as mild to moderate for purposes of the hypothetical. Also ... no unrestricted heights, and I don't think he should work around hazardous machinery. Those are the limitations that I want you to consider in answering whether or not, given his vocational profile and the limitations instructed by the Court, he could perform any of his past relevant work.

[R 73–74] The VE testified that based upon the restrictions set forth by the ALJ, the plaintiff would not be able to perform any of his prior relevant work. [R 74] The VE was asked about other jobs the plaintiff could do based upon the above restrictions, and testified that there would be jobs at the light and sedentary exertional level that the plaintiff could do. [R 74–76] The VE was asked if the plaintiff would be able to work with moderately severe to severe pain. The VE responded that he would not. [R 76] The VE testified that moderately severe to severe depression and/or anxiety would also preclude work. [R 76–77] The ALJ did not ask the VE the vocational impact of a lack of short-term memory and an inability to concentrate to the extent the plaintiff alleged in his testimony.

■ The ALJ found the plaintiff suffered from the following severe impairments: "[B]orderline IQ, cognitive disorder, N.O.S., moderate major depression, single episode in partial remission and [status post] right closed fracture of the clavicle." [R 29] He did not specifically find that these conditions satisfied the Eleventh Circuit's pain standard to be applied in cases of subjective complaints with respect to his impaired memory and other cognitive complaints. However, it is clear to the court that the plaintiff's objective injuries suffered during his motor vehicle accident were of such severity that they would satisfy the second prong of the second part of that standard. The objective medical evidence documents that the plaintiff suffered encephalomalacia as a residual result of his automobile accident. This softening of the brain resulting from the trauma caused by the motor vehicle accident constitutes an objective medical condition that could reasonably be expected to give rise to the cognitive problems reported by the plaintiff. A contrary conclusion would not be supported by substantial medical evidence in the record. Therefore, unless the ALJ properly discredited the plaintiff's subjective testimony, it must be accepted as true.

■ The ALJ refused to credit the plaintiff's testimony and that of his mother about the extent of his short-term memory problems and inability to concentrate. The ALJ's articulated reasons for refusing to credit the plaintiff and his

mother are not supported by substantial evidence. The ALJ rejected the testimony of the plaintiff and his mother because of "discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the findings made on examination and the claimant's assertions concerning his ability to work." [R 24]

The ALJ's credibility determination begins with a discussion of the plaintiff's treatment following the automobile accident. [R 24–25] Reading that discussion one is left with the impression that the ALJ believed the plaintiff left the hospital a well man. For example: "By the eleventh day of hospitalization [February 23, 1999], his physical therapy was discontinued as he was ambulating with good balance and function and he had achieved all goals. A speech/language evaluation revealed findings that were within functional limits." [R 25] The physical therapy note does not indicate what the physical therapy goals were, therefore, the achievement of those goals does not really say anything about the plaintiff's ability to function. The speech/language evaluation referred to by the ALJ was done to "[r]ule out risk of aspiration and further assess the pharyngeal phase of the swallow." [R 201] In other words, the test was done in part to determine if the plaintiff was able to safely swallow food without aspirating it into his lungs. This evaluation followed notes by the speech pathologist indicating the plaintiff exhibited "moderate oral phase dysphagia characterized by difficulty chewing soft consistencies, diff[iculties] forming a cohesive bolus, residual food remaining in oral cavity . . . ." [R 238] To be found "within functional limits" on such evaluation does not, therefore, go very far toward demonstrating the plaintiff's ability to perform work. The case manager's note of March 3, 1999, when the plaintiff had been hospitalized for three weeks presents a better picture of the plaintiff's condition at the time he was discharged three days later:

> [Plaintiff's mother] can take pt home [with] her but she is unable to stay [with] him [and] care for him during the day. Home Health Care [and] sitters are not an option due to private pay status.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Dr. Feist please advise of [discharge] plans Re: possibility for Rehab? Psych Admission? DHR placement to [nursing] home?

[R 231] The case manager clearly did not believe the plaintiff was capable of caring for himself at the time he was discharged.

The ALJ continued his articulation of reasons for refusing to credit the plaintiff's testimony by noting the plaintiff was "scheduled to begin outpatient treatment at the Calhoun–Clebourne Mental Health Board in the Adult Programs Alcohol Abuse Day Treatment" but did not begin treatment until November 29, 1999. This was apparently seen by the ALJ as either noncompliance with treatment by the plaintiff or evidence that he did not need treatment. There are notes by the case manager indicating the plaintiff was to be seen for evaluation at the Calhoun–Clebourne Mental Health Center on March 11, 1999. [R 230] However, the note also shows that this was part of the plan to discharge the plaintiff to his mother's home with adult day care treatment to be available at the Calhoun–Clebourne Mental Health Center. [R 230] There is nothing in the record indicating this was a prescribed treatment by any of the plaintiff's physicians. Nor is there anything in the record explaining why the plaintiff was not evaluated prior to November 1999. The ALJ, therefore, had no evidence upon which to base his apparent belief that the

time delay somehow damaged the plaintiff's credibility.

The next item discussed by the ALJ was the plaintiff's testimony concerning a therapist from the Head Injury Foundation:

> The claimant's testimony, as well as the testimony of his mother, indicated that a therapist from the Head Injury Foundation was involved with his care. The claimant's mother testified that he was helped by a counselor from that Foundation after his hospitalization. The claimant testified that he had been treated by a representative associated with the Foundation from two months after his accident until the present time. He stated that he participated in treatment once each month and he last saw his therapist one month prior to the hearing. However, the record contains no evidence that this type of rehabilitation was ever instituted. The hospital records do not reflect this nor do any of the claimant's attending or treating physicians mention this type of counseling. The claimant reported to Dr. Samuel E. Fleming, III, on December 8, 2000, approximately one month after the hearing that he attended "Head Injury Society Meetings" once per week.

[R 25] The ALJ apparently believes this shows the plaintiff is not credible. The plaintiff's testimony about his contact with someone from the "Head Injury Foundation" was as follows:

> A: .... I've had this lady from the head injury, her name is Nadiene Dunn. She sees me—these things like—these games for memory, memorization and stuff like that, and just little games. Putting a square peg in a round hole, or square peg [in] a square hole, or remembering subtracting from 7. Doing stuff like this for

my memorization. I become frustrated doing stuff like that . . . .

[R 49–50]

> A: And I'm trying to—hopefully I'm going to go back—I'm going to be in what they call vocational rehab. So, that's going to be—you know, I after I leave this from here, you know, I'm still going to try to get back in—I'm not giving up is what I'm trying to say. I'm not just relying on a disability check to get a check, because that's not what I'm here for. I'm really frustrated because of the head injury, but I'm trying to get into vocational rehab and the Nadiene Dunn, is from the head injury, is, you know, is trying to help me. So, I'm not just here trying to get a check.

> Q: ... [Y]ou said she gave you these games to play, is [sic.] she given you some other things to do to help you with your memory?

> A: Yes, Sir.

> \* \* \* \* \* \*

> A: She's told me to keep a diary, which I do that, and she says whatever is in my mind, write it down . . . . [A]s far as my memory, it's not really helping, but it's helping my irritability and my frustration, because of the injury.

[R 51]

> Q: The vocational rehabilitation that you told me about, how long have you been in the vocational rehabilitation program?

> A: Since—after the wreck. About two months after the wreck.

> \* \* \* \* \* \*

> Q: How often do you, do you attend the vocational rehabilitation.

> A: I met with a lady once a month.

> Q: Uh-huh.

A: She's waiting on my now to get a release for my shoulder to put me in the vocational rehab, you know, and I guess it would be a transaction.

[R 53] The ALJ also asked the plaintiff's attorney about the vocational rehabilitation:

ALJ: Mr. Long, let me ask you. Did we—do we have any notes form the rehabilitation that he's already engaged in?

ATTY: No, sir. Not to my knowledge. They are not in the file.

[R 57] The ALJ did not ask the attorney to locate or submit the records. The ALJ continued to question the plaintiff about the rehabilitation:

Q: Mr. Pritchett, you said once you released [sic] as far you shoulder is concerned, then they will schedule for your rehabilitation?

A: They were—the lady said—the lady, her name is Nadiene Dunn. She's with Alabama Head Injury Foundation.

Q: Uh-huh, uh-huh.

A: She said one [sic] they were—I get a medical release, that they would schedule me a two week—what's the correct word I'm looking for. I guess it would be a trail [sic]. A two week, you know, a trial and see how I do.

Q: All right.

A: As far as, you know, work type of environments.

[R 57–58]

The plaintiff's mother testified about assistance she and her son received from the Alabama Head Injury Foundation:

He would get hostile and I think if I had not had a neighbor who had—had a son who had a injury, i[sic] would not have been able to have gotten some help from the—it was Alabama Head Injury Foundation. They had like a social worker whose name was Larry Rabarden. He come out to our trailer .... He told me,

he says you are going to have to show tough love is the way he explained it, and that I was going to have to get in charge of the house and me being able to live with John and try to help him and to—and I was just going to have to come tough and say look, you got to back off. You got to stop this. This is not acceptable. This is inappropriate. You know, you just, you just can't do this anymore. So, when I started doing that, we were able to tolerate each other a little bit better.

[R 60–61] Following the plaintiff's mother's testimony, the ALJ questioned the plaintiff further about the vocational rehabilitation:

Q: .... With respect to the, the rehabilitation as far as your memory as a result of the head injury that you had, I wasn't exactly sure. Are you still receiving some help from the foundation or the organization that you told me about?

A: She hadn't sent me any paperwork or anything in awhile, but I met with her last month—

Q: Uh-huh.

A: -and she wants me to get a doctor's release like I stated earlier.

Q: Uh-huh.

A: and then set up for the two weeks training, or the two weeks trial period-

Q: All right.

A: -at the vocational rehab?

Q: Uh-huh. What are your plans in terms of getting the release?

A: The doctor stated that he wanted to let the injury completely heal and then try to take—see I got metal holding it together. Holding the bone together, and he wanted it to completely heal, and that would be

in December sometime. Then he wanted to take it out. Take the metal and stuff out of the shoulder. [R 65–66]

 While there appears to be no reference to the plaintiff receiving rehabilitation in his medical records, the testimony of the plaintiff's mother suggests that it was through a friend that she was able to get assistance from the Alabama Head Injury Foundation. There is, therefore, no reason to believe that the plaintiff's physicians were involved with the assistance he received from the Foundation. It is also important to note that the ALJ did not ask the plaintiff's attorney to obtain records from the Foundation for insertion into the record. If the ALJ did not believe the plaintiff was being seen by anyone from the foundation, he should have at a minimum requested that the plaintiff submit proof of such assistance.

 Another reason articulated by the ALJ for refusing to credit the testimony of the plaintiff and of his mother, was that he had not reported to Dr. Fleming that he had attended trade school or college. The ALJ noted this was contrary to his testimony at his hearing. [R 26] The ALJ also noted the plaintiff had denied any mental health treatment when questioned by Dr. Fleming, but had in fact received treatment at the Calhoun–Clebourne Mental Health Board. [R 26] The ALJ continued by noting that Dr. Fleming had opined the plaintiff had underperformed on the IQ testing administered in connection with his consultative exam. [R 26] There is a flaw with the ALJ's reasoning common to all three of these examples. The plaintiff alleges he is disabled because of severe memory problems and an inability to concentrate resulting from the brain damage he suffered as a result of the motor vehicle accident. To discredit his testimony because he gave differing reports as to his educational background and mental health

treatment is not appropriate, because these are precisely the sort of discrepancies one would expect from someone with the cognitive deficits alleged by the plaintiff. In fact, had the plaintiff been flawlessly consistent in his reports about his education and mental health treatment, that might actually be seen as negating his poor memory claims. The same analysis applies to the plaintiff's perceived lack of interest in his IQ testing. This is exactly the behavior one would expect from someone with severe concentration problems secondary to brain damage. Dr. Fleming, while reporting the apparent lack of effort, does not characterize it as malingering, and he noted in his report that the plaintiff "presented a number of symptoms related to his closed head trauma including impaired short term memory and concentration . . . ." [R 302]

Another reason cited by the ALJ for refusing to credit the plaintiff's testimony was that he testified that he had gained about 80 pounds since his accident, when it appears he had only gained about 40 pounds during that time. [R 26] The ALJ based this on emergency room records from just before the plaintiff's automobile accident, which showed he weighed 168 pounds. There are apparently no records showing what the plaintiff weighed at the time he was discharged from the hospital following his wreck. The records do reveal, however, that the plaintiff had difficulty eating during his hospital stay. For example, on February 18, it was noted the plaintiff "won't eat." [R 243] On February 20, there is a note from a dietician that indicates it was a follow-up secondary to weight loss, which had stabilized. [R 240] On February 27, the dietician again saw the plaintiff and noted he was not meeting his nutritional needs, although his food intake had increased. [R 233] The swallow testing conducted because of his dysphagia also indicates the plaintiff was having trou-

ble maintaining adequate dietary intake. It is highly likely that after a three week hospital stay the plaintiff had lost weight and no longer weighed 168 pounds. Therefore, the plaintiff's statement concerning his weight gain was likely less inaccurate than suggested by the ALJ. In any event, there is no reason to believe the plaintiff was intentionally exaggerating his weight gain. He might have simply been unaware precisely how much weight he had gained.

The ALJ concluded his credibility discussion with respect to the plaintiff's symptoms resulting from his brain damage as follows:

Substantial evidence demonstrates that the claimant's activities of daily living and that his difficulties in maintaining social functioning are no more than moderately impaired. He has a mild difficulty in maintaining concentration, persistence, and pace. He has no repeated episodes of decompensation.

[R 27] As the above discussion illustrates, the reasons articulated for rejecting the plaintiff's allegations about symptoms resulting from his brain damage are not in fact supported by substantial evidence.[6] This becomes even more apparent when evidence not discussed by the ALJ in his decision is considered.

Even though the ALJ carefully analyzed Dr. Fleming's consultative report for evidence that would discredit the plaintiff's allegations of disability, he failed to mention very relevant portions of that report that supported the plaintiff's claim. In the Summary and Conclusions section of his report, Dr. Fleming included the following:

Mr Pritchett also presented a number of symptoms related to his closed head trauma *including impaired short term memory and concentration*, migraine headaches, loss of temper and anterior grade and retrograde amnesia. *Mr. Pritchett does not seem capable of coping with the demands of a normal work day environment.* While he is capable of understanding and carrying out instructions, he would have difficulty recalling them. Interactions with coworkers and supervisors would likely be adequate.

[R 302 (Emphasis added).] The Social Security Administration's consulting neuropsychologist, after conducting his examination, concluded the plaintiff "does not seem capable of coping with the demands of a normal work day environment." This is strong evidence supporting the plaintiff's allegations of disability. Dr. Fleming's notation that the plaintiff had a number of symptoms related to his closed head trauma, including "impaired memory and concentration," also supports the plaintiff's allegations. Both of these highly relevant conclusions of Dr. Fleming were ignored by the ALJ.

 Based on the above, the court concludes that substantial evidence does not support the ALJ's articulation of reasons for rejecting the plaintiff's subjective testimony about his cognitive impairments. Therefore, that testimony must be accepted as true. Because the ALJ found the

---

**6.** The ALJ also determined the plaintiff's allegations of right shoulder problems were not credible because of his behavior during his visit to Dr. Rickless:

[W]hen he was outside of Dr. Rickless [sic.] office, and unaware that he was being observed, the claimant used his right upper extremity, including his hand, to perform activities which he alleged he was unable to

complete, raising a genuine question on the validity of restrictions or pain asserted.

[R 27] The plaintiff's allegations about his right shoulder are not relevant to his alleged disability because of cognitive problems and the ALJ did not cite this apparently inconsistent behavior as a reason for refusing to credit his allegations relating to that impairment.

plaintiff could not return to his prior relevant work, the burden was on the Commissioner to show other work the plaintiff could perform. The Commissioner failed to carry this burden because the expert vocational testimony did not include restrictions corresponding to the plaintiff's testimony. Therefore, the plaintiff is disabled within the meaning of the Social Security Act. The decision of the Commissioner will be reversed and the action remanded with instructions that the plaintiff be awarded the benefits claimed.

## THE PLAINTIFF'S MOTION FOR DISCOVERY

■ The plaintiff has moved for order allowing limited discovery in this action in order to determine if ALJ Jerome L. Munford is biased against all claimants seeking disability benefits. The plaintiff's attorney argues in support of the motion that he has had 193 cases decided by ALJs in the previous five years. He states that he has received unfavorable decisions in 59 cases, representing 30.57 percent of all cases decided by ALJs. He further states that ALJ Jerome L. Munford decided seven of those cases. He states that ALJ Munford issued unfavorable decisions in five of them, representing 71.43 percent of those seven decisions. He argues that this shows ALJ Munford is biased against Social Security claimants.

Because the court has determined the action is due to be reversed and benefits awarded, the plaintiff's motion for limited discovery is rendered moot. However, the court feels compelled to note what appears to be evidence of bias, at least toward this claimant, contained in the ALJ's decision.

The court has observed above that ALJ Munford did not mention in his opinion evidence favorable to the plaintiff from the consultative neuropsychologist to which he referred the plaintiff. Dr. Fleming concluded the plaintiff "does not seem capable of coping with the demands of a normal work day environment," because, "[w]hile he is capable of understanding and carrying out instructions, he would have difficulty recalling them." It is unlikely this represents an innocent oversight in view of the careful consideration ALJ Munford gave to other portions of Dr. Fleming's report. This conclusion by Dr. Fleming is such strong evidence of disability that to ignore it intentionally would seem to be evidence of bias against this plaintiff.

ALJ Munford also failed to include other evidence from Dr. Fleming's report that was favorable to the plaintiff. ALJ Munford listed a number of areas in which Dr. Fleming found the plaintiff to be only mildly restricted. [R 23] He also listed one area in which Dr. Fleming found "marked" restrictions-"his ability to carry out detailed or complex instructions." However, he failed to list the five areas in which Dr. Fleming found "moderate" restrictions in the plaintiff's abilities. Those areas were:

- Respond appropriately to supervisors
- Use judgment in detailed or complex work-related decisions
- Deal with changes in a routine work setting
- Understand, remember, and carry out simple, one and two-step instructions
- Maintain attention, concentration or pace for periods of at least two hours

These areas of moderate restriction are very relevant to a determination of whether the plaintiff would be able to perform other work. To have listed those areas in which the restriction was "mild" and "marked," while leaving out the highly relevant areas in which the plaintiff had "moderate" restrictions, suggests again that ALJ Munford refused to consider evidence favorable to the plaintiff.

Other areas of the ALJ's decision suggest the possibility of bias. He states the plaintiff's mother "testified that the claimant tried to cut a few yards, but he became angry and quit because he said that the jobs did not pay enough." [R 18] This is a gross mis-characterization of the plaintiff's mother's testimony.[7] The entire point of her testimony was to point out the severe level of cognitive deficit suffered by the plaintiff. To summarize her testimony as the ALJ did is very misleading. If done intentionally, it would be evidence of bias against this claimant.

The court has noted above flaws with the ALJ's reasons for refusing to credit the plaintiff's subjective complaints, including his reference to a speech/language evaluation during the time the plaintiff was hospitalized following his motor vehicle accident. As discussed above, the necessity of such a test shows the extreme severity of the plaintiff's injuries. To note that the result was within functional limits, without putting the purpose of the test in context, is misleading.

Any one of the above illustrations standing alone might be overlooked. There is a fine line between putting the best face on the facts and intentionally characterizing them in a misleading way. However, when considered together, the faint and hazy shadow of intentional bias begins to be discernable. Because of the determination on the merits, the court is not called upon in this case to determine if ALJ Munford exhibited bias. For the present that faint shadow need not be examined more closely.

While it is not necessary to consider the plaintiff's charge of general bias in the instant case, the court notes that such charges might warrant investigation in an appropriate case. The importance of an impartial administrative adjudicator has been recognized in this circuit:

> The Social Security Act "contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing." *Heckler v. Campbell*, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66, 74 (1983). A claimant is entitled to a hearing that is both full and fair.

*Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996). The court in *Miles* recognized the critical role played by the ALJ in the disability review process:

> The ALJ plays a crucial role in the disability review process. Not only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving *individualized consideration* to each claim that comes before him. Because of the deferential standard of review applied to his decision-making, the ALJ's resolution will usually be the final word on a claimant's entitlement to benefits. The impartiality of the ALJ is thus integral to the integrity of the system.

*Id.* at 1401 (emphasis added). If an ALJ has a bias against all Social Security claimants, or a particular group of claimants,[8] the individualized consideration of their claims will be lacking. This would seriously compromise the Social Security review process. Therefore, a reviewing court

---

7. The entire testimony on this subject by plaintiff's mother is found *supra* at page 1235.

8. Examples of such groups that come to mind would include alcoholics, a group to which the plaintiff in this case belongs. Other examples might be those who have received workmen's compensation awards, drug ad-

dicts, and those who live in households containing other persons receiving disability or SSI benefits. In accordance with the standards that apply when drug or alcohol use contributes to a claimant's disability (*See,* 42 U.S.C. § 423(d)(2)(C)), these individuals are entitled to a fair and unbiased consideration of their claims.

must take seriously allegations of generalized bias on the part of an ALJ.

The Third Circuit Court of Appeals has recognized that in appropriate cases, a plaintiff may seek to establish the generalized bias of an ALJ by using the discovery procedures provided for by the Federal Rules of Civil Procedure.[9] In *Hummel v. Heckler*, the court noted that in some cases "facts with respect to the fairness of [the administrative] proceeding can be developed only in the district court." 736 F.2d 91, 93 (3rd Cir.1984). In *Hummel* the court held that "where information relating to a contention bearing on the fundamental fairness of the agency hearing is in the possession of the government, discovery is available to the section 405(g) plaintiff so that she can attempt to convince the district court that a remand to the Secretary for the taking of new evidence is appropriate." *Id.* at 95. In *Hummel* the information in the hands of the government related to whether the ALJ who decided the plaintiff's case had been subject to a "Bellmon Review."[10] In the present case the plaintiff seeks to discover statistics on the decisions of ALJ Munford and those of ALJs nationwide in order to show that ALJ Munford is biased

in general against Social Security claimants. Because the court is not called upon to decide the issue in the present case, the court need not delve into the question of whether this sort of information would satisfy the standard set forth in *Hummel.*

*Hummel* is not the only Third Circuit case involving discovery in the district courts. In *Grant v. Shalala*, 989 F.2d 1332 (3rd Cir.1993), that court again examined allegations of ALJ bias. The court noted that the discovery allowed by *Hummel* would be "limited to the development of those facts and issues that are appropriate, on remand, to the Secretary's consideration of the existence of bias in connection with those benefit claims that are the subject of the section 205(g) action or actions before the district court." *Id.* at 1344. The court held the district court "lacks the authority to conduct a trial and make independent findings of fact concerning the alleged bias of [an ALJ]." *Id.* at 1346. The court, however, noted the district court could review the findings of the Commissioner on the issue of an ALJ's bias. *Id. Grant*, therefore, did not overrule *Hummel*, and in appropriate cases, the Third Circuit continues to recognize a

---

**9.** Allowing such discovery under the Federal Rules reflects the ancient bill for discovery. Bills for discovery were used prior to the advent of modern discovery practice to allow a plaintiff to ascertain from a defendant facts that would materially aid the plaintiff in a suit at law. *See e.g.* Henry Upson Sims, *Chancery Pleading an Practice in Alabama* 441 (1909)(discussing bills of discovery in English practice and in the early practice in Alabama). The right of a plaintiff to maintain a bill for discovery derives from the ancient jurisdiction of the courts of chancery in England.

> That bills for discovery and relief inhered in the ancient jurisdiction of courts of chancery in England at the time of the adoption of the federal judiciary act is beyond question. This being so, the like jurisdiction inheres in the federal courts, unless abol-

ished by statutes, changed or modified by some rule adopted by the Supreme Court. *McMullen Lumber Co. v. Strother*, 136 F. 295, 301 (8th Cir.1905). In many cases the discovery mechanisms afforded by the Federal Rules of Civil Procedure afford an adequate and complete remedy at law. But in cases in which they do not, the ancient bill for discovery might afford a Social Security plaintiff the opportunity to have discovery in order to prove his claim of ALJ bias. *See* Charles Allen Wright, Arthur R. Miller & Richard L. Marcus *Federal Practice & Procedure* § 2005 n. 3 (noting that for the most part the Federal Rules replace bills for discovery, but also noting one instance in which such a bill might properly lie).

**10.** For a discussion of the "Bellmon Review" program, *see Hummel* at 94.

Social Security plaintiff's right to have discovery in the district court.[11]

It would not be prudent or appropriate for the court to decide what circumstances would warrant the allowance of discovery in future cases. It is sufficient to note that based upon the decisions in the Third Circuit, in an appropriate case, discovery might be proper in the district court. The court is hopeful that any allegations of bias properly presented at the administrative level would receive a fair and full hearing, for that is the minimum that should be expected from the agency charged with administering Social Security claims. Should that not prove to be the case, this court will deal with claims of ALJ bias if and when they are properly presented.

**OTHER PENDING MOTIONS**

■ The Commissioner has filed a motion asking this court to reconsider its order of February 4, 2002, allowing the plaintiff to supplement the record. The Commissioner is correct in her contention that evidence not submitted at the administrative level cannot be considered by the court except in determining whether the action should be remanded for additional proceedings. The court has not considered the additional medical records submitted by the plaintiff or any of the other supplemental evidence in reaching its decision on the merits. The court will amend its February 4, 2002, order to make clear that the evidence was received for the purposes of considering whether the action should be remanded, and was not part of the record for decision on the merits. Plaintiff has filed a motion to substitute a

redacted copy of the supplemental evidence. That motion will be granted. The Commissioner's motion for remand under sentence six of 42 U.S.C. § 405(g) is made moot by the court's decision on the merits.

**CONCLUSION**

Substantial evidence does not support the decision of the Commissioner. The plaintiff is disabled within the meaning of the Social Security Act and a contrary decision would not be supported by substantial evidence. The plaintiff's motion for limited discovery and the Commissioner's motion for remand are rendered moot by the court's decision on the merits. The Commissioner's motion for reconsideration will be granted in part. The plaintiff's motion to substitute redacted copies of his submission will be granted.

An appropriate order will be entered contemporaneously herewith.

*FINAL ORDER*

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the defendant's motion for reconsideration [Doc. # 17] is GRANTED and the court's order of February 4, 2002, is hereby AMENDED to provide that the plaintiff's motion to supplement the record is granted, but that the submission is received by the court only for the purpose of

---

11. Following the decision by the court of appeals, the district court remanded the action to the Commissioner for further investigation of the plaintiffs' allegations of bias. *Grant v. Commissioner,* 111 F.Supp.2d 556, 558 (M.D.Pa.2000). Following that remand, the court determined substantial evidence did not support the Commissioner's determination

that the ALJ in question was not biased and ordered that new administrative hearings be conducted in the cases of each of the class members. *Id.* at 570. The opinion of the district court is instructive as to the procedures to be followed in cases involving allegations of generalized bias.

considering whether the action should be remanded. It is

FURTHER ORDERED that the plaintiff's motion to allow limited discovery [Doc. # 5] and the defendant's motion for remand [Doc. # 18] are MOOT. It is

FURTHER ORDERED that the plaintiff's motion to substitute redacted copies [Doc. # 24] is hereby GRANTED. It is

FURTHER ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration be and it hereby is REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed. It is

FURTHER ORDERED that the Commissioner withhold from payments which he may determine are due plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of section 206 of the Social Security Act, as amended, 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.